UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY GEROME YOUNG,<br><br>Plaintiff,<br><br>v.<br><br>RODRIGUEZ, et al.,<br><br>Defendants. | No. 2:15-cv-2604 KJM CKD P<br><br>FINDINGS & RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Currently before the court is defendants' motion for summary judgment. (ECF No. 48.)

I. Procedural History

This case proceeds on plaintiff's first amended complaint (ECF No. 9), which was screened by the court and found to state claims against defendants Rodriguez, Lewis, Saephan, and Gill (ECF No. 10). In screening the first amended complaint, the court simply held that it stated a cognizable claim and cited to the screening of the original complaint. (Id. at 1 (citing ECF No. 5).) The original screening order stated that plaintiff had "implicate[d] the free exercise clause." (ECF No. 5 at 4.) After the close of discovery, defendants filed a motion for summary judgment (ECF No. 29) that plaintiff opposed (ECF No. 33). Once briefing was complete, it came to the court's attention that because of the screening order's lack of clarity, defendants had

1

proceeded as though the complaint contained only a First Amendment claim, even though it also clearly implicated the Fourteenth Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA). (ECF No. 43 at 1.) The motion for summary judgment was then vacated and discovery was re-opened to allow additional discovery related to those claims. (Id. at 2.) Once discovery closed, defendants filed another motion for summary judgment (ECF No. 48), which plaintiff opposes (ECF No. 53). The motion is now fully briefed and ready for disposition.

II. Plaintiff's Allegations

Plaintiff alleges that he is, and was at all times relevant to the complaint, a practicing Rastafarian. (ECF No. 9 at 1, ¶ 2.) As a requirement of his faith, he must wear a head covering, or Crown, at all times when in public. (Id. at 2-3, ¶ 14.) On September 21, 2014, plaintiff's daughter, whom he had not seen in thirteen years, came to visit him while he was housed at California Health Care Facility (CHCF). (Id. at 3-4, ¶ 15, 23.) Plaintiff asserts that defendants Saephan, Gill, Lewis, and Rodriguez violated his right to practice his religion when they refused to let him wear his Crown into the visitation room even though other inmates are permitted to wear their religious head coverings. (Id. at 3-6, ¶¶ 17-23, 31-37, 41.) When plaintiff refused to remove his Crown he was denied visitation, which irreparably damaged his relationship with his daughter. (Id. at 7, 9-10 ¶¶ 43, 60, 63.)

III. Motion for Summary Judgment

A. Defendants' Arguments

Defendants argue that plaintiff's First Amendment rights were not violated because his religious practice was not substantially burdened since other methods of practicing his faith were available and the regulation was reasonably related to a legitimate penological interest. (ECF No. 48-2 at 3-7.) They also argue that he is not entitled to relief under RLUIPA because they did not infringe on a sincerely-held belief, his religious practice was not substantially burdened, the regulation was the least restrictive means of furthering the prison's compelling governmental interests in security and use of resources, and his claim for injunctive relief is moot. (Id. at 8-10.) Finally, defendants argue that any burden to plaintiff was de minimis and that they are entitled to qualified immunity. (Id. at 7, 12-14.)

2

B. <u>Plaintiff's Response</u>

It is well-established that the pleadings of pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers." <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972) (per curiam). Nevertheless, "[p]ro se litigants must follow the same rules of procedure that govern other litigants." <u>King v. Atiyeh</u>, 814 F.2d 565, 567 (9th Cir. 1987) (citations omitted), <u>overruled on other grounds</u>, <u>Lacey v. Maricopa County</u>, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, the unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited access to legal materials" as well as "sources of proof." <u>Jacobsen v. Filler</u>, 790 F.2d 1362, 1364-65 & n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted). Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. <u>Id.</u> at 1364 n.4 (citation omitted).

The court is mindful of the Ninth Circuit's more overarching caution in this context, as noted above, that district courts are to "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (citation omitted). Accordingly, though plaintiff has largely complied with the rules of procedure, the court will consider the record before it in its entirety. However, only those assertions in the opposition which have evidentiary support in the record will be considered.

Plaintiff argues that defendants' motion should be denied because defendants misrepresent the religious practice that was burdened, his actual religious practice was burdened without any valid penological interest, that he was treated differently because of his religion, the burden was not de minimis, and defendants are not entitled to qualified immunity because they should have known that refusing to let him wear his Crown was a violation of his rights. (ECF No. 53 at 12-27.) Plaintiff does not appear to disagree that his claim for relief under RLUIPA is now moot.

///

///

3

IV. <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." <u>Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u>

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l Bank of Ariz. V. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" Id. Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Costa Cnty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

On June 15, 2018, defendants served plaintiff with notice of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF No. 48-1; see Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir. 1988); Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998) (en banc) (movant may provide notice).

////

5

V.     Undisputed Material Facts

At all times relevant to the complaint, plaintiff was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) and housed at CHCF. (Defendants' Statement of Undisputed Facts (DSUF) (ECF No. 48-3) ¶¶ 1-2; Response to DSUF (ECF No. 53 at 32-36) ¶¶ 1-2.)  At all times relevant to the complaint, defendants Lewis, Saephan, Gill, and Rodriguez were employed at CHCF. (DSUF ¶¶ 3-6; Response to DSUF ¶¶ 3-6.)

On September 21, 2014, plaintiff was processed for a visit at CHCF. (DSUF ¶ 7; Response to DSUF ¶ 7.)  When plaintiff arrived at visitation, he was wearing both a yarmulke and a Rastafarian Crown. (DSUF ¶ 8; Response to DSUF ¶ 8.)  Both items were covered by the Religious Personal Property Matrix at that time. (Biggs Decl. (ECF No. 48-5) ¶ 5; Young Decl. (ECF No. 53 at 39-45) ¶ 23.)  Plaintiff ultimately returned to his cell without seeing his visitors. (DSUF ¶ 10; Response to DSUF ¶ 10.)

VI.     Discussion

A.     Sufficiency of Defendants' Statement of Facts

Local Rule 260(a), requires that the statement of facts "enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact." However, though defendants' statement of facts cites the declarations of defendant Lewis and non-party Lt. Biggs as support for the facts that (1) Saephan and Gill stopped plaintiff pursuant to policy, (2) plaintiff was given an opportunity to return one item of religious headgear to his cell, (3) plaintiff chose to return to his cell after refusing to remove his religious headgear, and (4) plaintiff would have been able to go to visitation if he had worn only one piece of religious headgear (DSUF ¶¶ 9-10, 22), neither declaration establishes that the declarant was present for the interactions between plaintiff and Saephan and Gill (Biggs Decl.; Lewis Decl. (ECF No. 48-6)).  Furthermore, plaintiff's opposition, which is consistent with the allegations in the complaint, clearly states that they were not (ECF No. 53 at 23, 26), and the declarants fail to offer any other basis for how they came by the knowledge they are testifying to

in their declarations.[1]

Additionally, although all four defendants seek summary judgment in their favor, any facts regarding Lewis and Rodriguez's involvement in the events of September 21, 2014, are noticeably absent from the statement of facts. Accordingly, based upon the facts contained in the statement of facts alone, there are insufficient facts regarding the conduct of Lewis and Rodriguez to determine that summary judgment in their favor is appropriate. However, even if the court were to overlook these issues, as set forth below, there are material disputes of fact that prevent granting summary judgment.

        B.        <u>Disputes of Fact</u>

Although the parties are in agreement that plaintiff went to visitation wearing both a yarmulke and a Crown and left without seeing his visitors, they are in dispute as to what occurred in between.

As outlined in his complaint, and reiterated in his opposition to the motion for summary judgment, plaintiff asserts that he was denied the ability to wear his Crown during visitation. Specifically, he asserts that after defendants Saephan and Gill gave him a clothed body search, he proceeded to the visitation room but was stopped by Saephan, who pointed at plaintiff's Crown and told him that he could not wear "that." (ECF No. 9 at 3, ¶¶ 16-17; Young Decl. ¶¶ 1-2.) Plaintiff explained to Saephan and Gill that he was a Rastafarian and his religion required him to wear his Crown while in public, and when they both continued to tell him that he could not wear it, he asked them to contact their supervisor. (ECF No. 9 at 3, ¶¶ 18-19; Young Decl. ¶¶ 3-4.) After calling their supervising sergeant, who was initially identified as "Stewart," but was later determined to be defendant Lewis, Saephan and Gill relayed to plaintiff that the sergeant said that he could not wear his Crown. (ECF No. 9 at 3, ¶¶ 20-21; Young Decl. ¶ 5.) Plaintiff then told Saephan and Gill that his visitor was his only child, whom he had not seen in thirteen years, and

---

[1] To the extent it can be inferred that Biggs' declaration is based on his conversation with plaintiff, and thereby escapes the rule against hearsay because it constitutes an opposing party's statement, the factual disputes that arise given plaintiff's adamant denial that he was given the opportunity to wear either the yarmulke or Crown and was denied visitation because he insisted on wearing both still remain.

7

asked them to call back their sergeant, which they refused to do. (ECF No. 9 at 3-4, ¶ 23; Young Decl. ¶ 8.)

After being told he could not wear his Crown, plaintiff returned to his unit where he spoke with non-defendants Ornelas and Biggs, and eventually returned to the visitation area to request to speak to the sergeant again. (ECF No. 9 at 4-5, ¶¶ 24-28; Young Decl. ¶¶ 9-12.) While he was speaking to Saephan and Gill, defendant Rodriguez arrived and instructed plaintiff to wait while Rodriguez went into the visiting room with Saephan and Gill. (ECF No. 9 at 5, ¶¶ 31-32; Young Decl. ¶ 12.) When Rodriguez returned to where plaintiff was, he informed plaintiff that he could not wear his "beanie" to visit, at which point plaintiff informed Rodriguez that plaintiff was a Rastafarian and that it was his Crown, which he wore for religious reasons. (ECF No. 9 at 5, ¶¶ 32-34; Young Decl. ¶¶ 12-14.) In response, Rodriguez denied having heard of Rastafarianism and implied that plaintiff had made it up. (ECF No. 9 at 5, ¶ 35; Young Decl. ¶ 15.) After pleading with Rodriguez some more, plaintiff eventually removed his Crown to show Rodriguez his hair, and when Rodriguez saw the yarmulke underneath he told plaintiff that he could wear the yarmulke, but not his Crown. (ECF No. 9 at 6, ¶¶ 36-37; Young Decl. ¶ 16.) Plaintiff was never told that he could wear either the yarmulke or his Crown; he was only given the option of returning his Crown to his cell and wearing the yarmulke. (Young Decl. ¶¶ 17, 22.)

Defendants' version of events, as set forth in their undisputed statement of facts, is noticeably bare and sets out that "Saephan and Gill stopped Plaintiff pursuant to policy, and he was given the opportunity to return one item of religious headgear to his cell before returning to visiting." (DSUF ¶ 9.) They further state that plaintiff "refused to remove his religious headgear and instead returned to his cell," and that he would have been able to see his visitors if he had worn only one piece of religious headgear. (DSUF ¶¶ 10, 22.)

The factual statements defendants make regarding what happened after plaintiff arrived at visitation on September 21, 2014, are technically in line with both parties' versions of events. (DSUF ¶¶ 9-10.) However, this apparent lack of conflict is due solely to the vagueness of the statements. Paragraph 9 states that "Defendants Saephan and Gill stopped Plaintiff pursuant to policy, and he was given the opportunity to return one item of religious headgear to his cell

8

before returning to visiting," while Paragraph 10 states that "Young refused to remove the religious headgear and instead returned to his cell." Paragraph 22 further asserts that "[h]ad Plaintiff complied with CDCR policy and only wore one piece of religious headgear, he would have been permitted to go to visiting."

The construction of these statements of fact is problematic because they are presented in such a way that the reader is left to presuppose that because plaintiff's Crown was recognized by policy as an item of religious headgear, it was recognized and treated as such by *defendants* on September 21, 2014. By referring to plaintiff's Crown and yarmulke collectively as "religious headgear," the further implication is that plaintiff was given a choice as to which item he would wear and which one he would return to his cell. Defendants' motion makes clear that this is the interpretation they are advancing, but it lacks foundation in the evidence.

According to the interview summaries contained in the response to plaintiff's grievance, Gill "remember[ed] Inmate Young refusing to remove his beanie," while "Saephan stated, 'I informed Inmate Young he would not be allowed to wear his beanie in visiting. Young stated the beanie was his religious crown. I informed Young beanies were not allowed in the visiting room. . . . I informed Young he could wear his Yarmulke but not his beanie.'" (ECF No . 48-6 at 16.) The summary further quotes defendant Rodriguez as saying that "'I told Young he could wear his Yarmulke but not his beanie, which he referred to as his religious crown. . . . I gave Young a choice to remove his beanie and wear his Yarmulke or refuse his visit.'" (Id.) These responses, which align with plaintiff's version of the facts, demonstrate that on September 21, 2014, only the yarmulke was recognized and treated by defendants as being religious headgear, and there were no circumstances under which plaintiff would be allowed to wear his Crown. In light of this, defendants' facts remain technically accurate, but take on a different subtext. The reference to "religious headgear" in Paragraphs 9 and 10 is now understood to refer specifically to plaintiff's Crown, while Paragraph 22's reference is clearly understood to mean the yarmulke.

As addressed below, the difference in how these facts are understood is material.

C. First Amendment

The First Amendment protects the right to the free exercise of religion. A religious claim must satisfy two criteria to merit protection under the free exercise clause of the First Amendment: (1) "the claimant's proffered belief must be sincerely held and (2) "the claim must be rooted in religious belief, not in purely secular philosophical concerns." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (citations and internal quotation marks omitted). "A prisoner's right to freely exercise his religion, however, is limited by institutional objectives and by the loss of freedom concomitant with incarceration." Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1122 (9th Cir. 2013) (citing O'Lone v. Shabazz, 482 U.S. 342, 348 (1987)). "[A] prisoner's Free Exercise Clause claim will fail if the State shows that the challenged action is 'reasonably related to legitimate penological interests.'" Walker v. Beard, 789 F.3d 1125, 1138 (9th Cir. 2015) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

In order to determine whether a policy is reasonable, analysis under Turner v. Safley, 482 U.S. 78 (1987), must be conducted. "As formulated by the court in Turner—and subsequently applied by [the Ninth Circuit] in Ashelman [v. Wawrzaszek], 111 F.3d 674 [(9th Cir. 1997)], and Ward v. Walsh, 1 F.3d 873 (9th Cir. 1993)—the test weighs four factors in determining the reasonableness of a prison regulation affecting constitutional rights." Resnick v. Adams, 348 F.3d 763, 768-69 (9th Cir. 2003). "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it" and "the governmental objective must be a legitimate and neutral one." Turner, 482 U.S. at 89-90 (citation and internal quotation marks omitted). "A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90. "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. Id. (citation omitted).

Defendants' motion rests on analyzing the reasonableness of the policy allowing prisoners to wear only one item of religious headgear to visitation, demonstrating that they are clearly espousing the interpretation of the facts that involves plaintiff having a choice between his Crown

10

and yarmulke. (ECF No. 48-2 at 3-7.) But the policy regarding how many pieces of religious headgear a prisoner could wear becomes irrelevant when these facts are interpreted in the context of plaintiff's version of the facts and the documentary evidence. As explained above, understood in this light, although plaintiff's Crown was a recognized item of religious headgear under CDCR policy, it was not treated as such by defendants and their arbitrary refusal to recognize plaintiff's Crown placed him in the position of having to choose between compliance with his religious beliefs or going to visitation. These factual disputes mean that with respect to plaintiff's First Amendment claim, the policy limiting religious headgear to one item becomes irrelevant. Instead, the challenged action is defendants' refusal to allow plaintiff to wear his Crown, which was a recognized item of religious headgear, and defendants have provided no analysis showing that the denial was "reasonably related to legitimate penological interests." Because defendants' motion does not address this issue, summary judgment should be denied.

### D. Fourteenth Amendment

"[T]he Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (quoting Cruz v. Beto, 405 U.S. 319, 322 (1972)). "This does not mean, however, that all prisoners must receive identical treatment and resources." Hartmann, 707 F.3d at 1123 (citing Cruz, 405 U.S. at 322 n.2; Ward, 1 F.3d at 880; Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987)). Rather, there must be "a good faith accommodation of the [prisoner's] rights in light of practical considerations." Allen, 827 F.2d at 569 (citation omitted). "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class." Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003) (citing Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)).

The factual disputes that exist are equally fatal to defendants' claim that they are entitled to summary judgment on plaintiff's Equal Protection claim. In their motion, they argue that plaintiff cannot demonstrate that he was subject to disparate treatment because no other religious

11

group was allowed to wear multiple pieces of religious headgear. (ECF No. 48-2 at 11-12.) But under plaintiff's version of the facts, the proper question is whether he was discriminated against when he was told he could wear a yarmulke, but not his Crown, even though both were recognized under CDCR policy as religious headgear. Defendants fail to address this question and summary judgment on this ground should also be denied.

### E. Defendant Lewis

Though defendant Lewis's involvement is not addressed in the statement of facts, review of her declaration reveals additional facts. According to her declaration, Saephan and Gill reached out to her to confirm that policy allowed only one item of religious headgear to be worn to visitation. (Lewis Decl. ¶ 4.) Lewis confirmed this fact and instructed Saephan and Gill "to allow Plaintiff to return an item of headgear to his cell and process him through visiting if he complied." (Id.) Based on these facts alone, analysis of CDCR's policy regarding the number of pieces of religious headgear a prisoner could wear to visitation would be appropriate as to Lewis's actions. However, in his declaration, plaintiff states that Saephan and Gill told him that Lewis's response to their inquiry was that plaintiff could not wear his Crown.[2] (Young Decl. ¶ 5.) Accordingly, there exists a dispute as to the basis on which Lewis denied plaintiff the ability to go to visitation and this dispute is material as already set forth above.

### F. De Minimis Burden

Defendants argue that plaintiff's First Amendment claim fails because the infringement on his rights was de minimis. (ECF No. 48-2 at 7.) However, the cases they rely on in support of this proposition are clearly distinguishable. Canell v. Lightner, the only controlling authority defendants cite, uses the term "de minimis" in analyzing whether the defendant had violated the Establishment Clause of the First Amendment. 143 F.3d 1210, 1214 (9th Cir. 1998). In analyzing the plaintiff's claim under the Free Exercise Clause, the Ninth Circuit found that the defendant's actions did not "constitute a substantial burden" on the plaintiff's rights. Id. at 1215

---

[2] Because it appears that Saephan and Gill were authorized to relay Lewis's response, this statement is not hearsay. Fed. R. Evid. 801(d)(2)(C).

(citing Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997)). However, in Canell, the defendant was accused of disturbing the plaintiff's Muslim prayers on no more than eighteen days out of a six-week period. Id. at 1212, 1215. This factual scenario differs substantially from the one at issue in this case, as the plaintiff in Canell was not forced to choose between adhering to his religion and participating in some activity that was otherwise available to all inmates. The other cases cited by defendants that involve application of the Free Exercise Clause in prison deal with instances where plaintiffs were not provided with a meal that complied with their religious requirements on a minimal number of occasions. Rapier v. Harris, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (non-pork tray not available for 3 out of 810 meals and there was no evidence that the failure was due to anything other than an institutional shortage); Furnace v. Sullivan, No. 07-cv-4441 MMC, 2008 WL 4856826, *3 (N.D. Cal. Nov. 10, 2008) (failure to provide meal that met plaintiff's religious dietary requirements on one occasion was a de minimis injury); Joseph v. Ware, No. 07-1297, 2007 WL 4144923, *2-3 (W.D. La. Oct. 22, 2007) (non-pork tray not provided on one occasion). Having to choose between skipping a meal on one occasion in order to remain in compliance with the requirements of one's religion does not compare to having to choose between remaining faithful to one's beliefs and being able to visit with one's family while incarcerated, absent some evidence that plaintiff regularly participated in visitation unhindered. However, the deprivation in this case cannot be said to be de minimis where plaintiff explained to defendants that his daughter was visiting from another state and that he had not seen her in thirteen years. The court does not find that the refusal to allow plaintiff to wear his Crown was either a de minimis burden or injury and summary judgment on this basis should be denied.

      G.    RLUIPA

Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government shows that the burden furthers "a compelling governmental interest" and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a).

> To state a claim under RLUIPA, a prisoner must show that: (1) he takes part in a "religious exercise," and (2) the State's actions have substantially burdened that exercise. See [Shakur, 514 F.3d] at 888-

13

> 89. If the prisoner satisfies those elements, then the State must prove its actions were the least restrictive means of furthering a compelling governmental interest. Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir. 2005).

Walker v. Beard, 789 F.3d 1125, 1135 (9th Cir. 2015). However, RLUIPA does not waive a state's sovereign immunity from suits for money damages, nor does it "authorize suits for damages against state officials in their individual capacities." Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015) (citing Sossamon v. Texas, 563 U.S. 277, 284-85 (2011); Wood v. Yordy, 753 F.3d 899, 903-04 (9th Cir. 2014)).

Because money damages are not available under RLUIPA, that leaves plaintiff's request for injunctive relief. (ECF No. 9 at 10.) But "when a prisoner is moved from a prison, his action will usually become moot as to conditions at that particular facility." Nelson v. Heiss, 271 F.3d 891, 897 (9th Cir. 2001) (citing Dilley v. Gunn, 64 F.3d 1365, 1368-69 (9th Cir. 1995)); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (claims for injunctive relief related to conditions of confinement were moot where prisoner was transferred to another facility and "demonstrated no reasonable expectation of returning to [the original facility]." (citing Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986))).

In their motion for summary judgment, defendants argue that plaintiff's transfer has in fact made his RLUIPA claims moot because he is no longer subject to the alleged conditions that violated RLUIPA. (ECF No. 48-2 at 11.) In opposing the motion for summary judgment, plaintiff neither disputes the mootness of his RLUIPA claims nor offers any evidence that he is still subject to the conditions that formed the basis of his claims. (ECF No. 53 at 1-27.)

As this court previously noted, plaintiff's transfer away from CHCF likely rendered his RLUIPA claims moot because the complaint appeared to challenge how CDCR policy was enforced at CHCF, rather than challenging CDCR policy itself. (ECF No. 43 at 2 n.1.) Furthermore, the complaint specifically requested injunctive relief in the form of a restraining order against officials at CHCF. (ECF No. 9 at 10.) In light of these facts and plaintiff's failure to dispute the mootness of his RLUIPA claim, the court finds that any claims for injunctive relief against defendants in their official capacities under RLUIPA are moot. Furthermore, to the extent

plaintiff is attempting to bring individual capacity claims against defendants under RLUIPA, they must fail. Accordingly, summary judgment should be granted in defendants' favor on plaintiff's RLUIPA claims.

### H. Qualified Immunity

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In analyzing a qualified immunity defense, the court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201 (2001) overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling Saucier's requirement that the two prongs be decided sequentially). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (alteration in original) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" Id. (emphasis in original). "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201).

These questions may be addressed in the order most appropriate to "the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. Thus, if a court decides that plaintiff's allegations do not support a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. On the other hand, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court need not determine whether plaintiff's allegations support a statutory or constitutional violation. Pearson, 555 U.S. at 236-42. "[S]ummary judgment based on qualified immunity is improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful." Schwenk

15

v. Hartford, 204 F.3d 1187, 1196 (9th Cir. 2000) (citing Grossman v. City of Portland, 33 F.3d 1200, 1208 (9th Cir. 1994)).

Defendants argue that they are entitled to qualified immunity because they were simply following policy, which a reasonable officer would have believed was lawful, and Saephan and Gill were further deferring to their superior. (ECF No. 48-2 at 13-14.) However, as set forth above, under plaintiff's version of the facts, defendants violated plaintiff's constitutional rights when they refused to allow him to wear his Crown to visitation without any justifiable reason, but would have allowed him to wear a yarmulke. As to whether a reasonable officer would have believed this conduct to be lawful, at the time, the Rastafarian Crown was recognized by CDCR policy as an item of religious headgear and prisoners were permitted to wear one item of religious headgear to visitation. Accordingly, defendants' conduct was not in line with policy. Furthermore, Saephan and Gill did not simply defer to their superior; they also made an independent decision to refuse to let plaintiff go to visitation wearing his Crown when he first arrived at visitation.

It was well established at the time that prison officials could not prevent a prisoner from "engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." Freeman, 125 F.3d at 736 (footnote omitted) (citing Turner, 482 U.S. at 89), overruled on other grounds by Shakur, 514 F.3d at 884-85. It was also clearly established that "each prisoner [was entitled] to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" Shakur, 514 F.3d at 891 (quoting Cruz, 405 U.S. at 322). Therefore, defendants' arguments that they are entitled to qualified immunity because they were following policy and that Saephan and Gill were deferring to their superiors are without merit and defendants have not shown that they are entitled to qualified immunity.

VII. Conclusion

Defendants' motion for summary judgment should be granted as to plaintiff's RLUIPA claims and denied as to the First and Fourteenth Amendment claims.

////

VIII.     Plain Language Summary of this Order for a Pro Se Litigant

Defendants' motion for summary judgment should be granted as to your RLUIPA claim because you are no longer at CHCF and you were only complaining about how the policy was carried out at CHCF. It is being recommended that your RLUIPA claim be dismissed. Defendants' motion for summary judgment on your First and Fourteenth Amendment claims should be denied because there is a disagreement between you and defendants as to what happened on September 21, 2014, and that disagreement affects the outcome of the case.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 48) be granted in part and denied in part as follows:

1. Granted as to plaintiff's RLUIPA claims.
2. Denied as to plaintiff's First and Fourteenth Amendment claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within **ten days** after service of the objections. **Due to exigencies in the court's calendar, no extensions of time will be granted.** The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 4, 2019

/s/ Carolyn K. Delaney
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

13:youn2604.msj.f&r

17